PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LUIS PUENTES FERNANDEZ,

*Petitioner,*

v.

PETER D. KEISLER, Acting Attorney General,

*Respondent.*

No. 06-2209

On Petition for Review of an Order
of the Board of Immigration Appeals.
(A13-377-329)

Argued: May 21, 2007

Decided: September 26, 2007

Before WILLIAMS, Chief Judge, and MOTZ and
SHEDD, Circuit Judges.

---

Petition for review denied by published opinion. Chief Judge Williams wrote the opinion, in which Judge Shedd concurred. Judge Motz wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Marc Seguinot, SEGUINOT & ASSOCIATES, P.C., McLean, Virginia, for Petitioner. Kristin Kay Edison, UNITED STATES DEPARTMENT OF JUSTICE, Office of Immigration Litigation, Civil Division, Washington, D.C., for Respondent. **ON BRIEF:** Peter D. Keisler, Assistant Attorney General, Civil Division,

James A. Hunolt, Senior Litigation Counsel, UNITED STATES DEPARTMENT OF JUSTICE, Office of Immigration Litigation, Civil Division, Washington, D.C., for Respondent.

## OPINION

WILLIAMS, Chief Judge:

Luis Puentes Fernandez, a native and citizen of Chile, petitions for review of an order of the Board of Immigration Appeals (BIA) ordering his removal from the United States. The BIA ordered Fernandez's removal based on his conviction in Virginia state court for distribution of oxycodone and Percocet. Fernandez seeks to avoid removal by arguing that under our decision in *United States v. Morin*, 80 F.3d 124 (4th Cir. 1996), he has demonstrated that he owes "permanent allegiance" to the United States and thus qualifies as a U.S. national under § 101(a)(22)(B) of the Immigration and Nationality Act (INA), 8 U.S.C.A. § 1101(a)(22)(B) (West 2005). That provision defines "national of the United States" as "a person who, though not a citizen of the United States, owes permanent allegiance to the United States." *Id.* The BIA rejected Fernandez's argument, concluding that § 1101(a)(22)(B) itself does not provide a means for acquiring U.S. national status.

Although we agree with Fernandez that he would qualify as a U.S. national under *Morin*, our decision in *Morin* did not purport to set forth the only possible interpretation of the definition of "national of the United States." Under *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), we must afford deference to the BIA's contrary, post-*Morin* interpretation of the INA if it is a "permissible construction of the statute." *Id.* at 843. We hold that it is. Accordingly, because Fernandez does not qualify as a "national of the United States" under the BIA's interpretation of the INA, and because we conclude that the BIA's interpretation is not "arbitrary, capricious, or manifestly contrary to the statute," *id.* at 844, we deny Fernandez's petition for review.

I.

Fernandez was born in Chile and was admitted to the United States as a lawful permanent resident on August 22, 1965, at the age of one.

He has been in the United States continuously since that time. At the age of eighteen, Fernandez registered for the Selective Service.

In 1996, Fernandez applied for U.S. citizenship, and on June 21, 1996, he attended his naturalization interview. According to Fernandez, he signed the affidavit of allegiance to the United States that is part of the citizenship application, and an application inspector told him that he would receive a notice in the mail advising him of the date of his oath ceremony.

After failing to receive a notice for some time, Fernandez began inquiring about the date of his oath ceremony. Fernandez never received the notice, and it is undisputed that he did not complete the naturalization process and is not a U.S. citizen.

On July 9, 2003, Fernandez pleaded guilty in Virginia state court to distribution of oxycodone and Percocet. The court sentenced him to twenty years' imprisonment, with seventeen years suspended.

On February 8, 2006, the Department of Homeland Security ("DHS") served Fernandez with a Notice to Appear before the Immigration Court, charging him with removability under 8 U.S.C.A. § 1227(a)(2)(A)(iii) (West 2005) for having been convicted of an aggravated felony (an offense related to the illicit trafficking of a controlled substance) and under 8 U.S.C.A. § 1227(a)(2)(B)(I) (West 2005) for having been convicted of a controlled substance offense after admission to the United States. In response, Fernandez argued for termination of the removal proceedings against him on the ground that he is an unremovable "national of the United States." (J.A. at 44.)[1]

On March 31, 2006, an immigration judge (IJ) conducted Fernandez's removal hearing. The hearing focused on whether Fernandez is a removable alien or an unremovable U.S. national. On April 21, 2006, the IJ terminated the removal proceedings against Fernandez, concluding that under our decision in *Morin*, Fernandez is a "national of the United States" because his permanent allegiance to the United States was established by virtue of his application for naturalization.

---

[1]Citations to "(J.A. at ___.)" refer to the contents of the Joint Appendix filed by the parties in this appeal.

Although the IJ stated that he agreed with the "better analysis" in the Ninth Circuit's decision in *Perdomo-Padilla v. Ashcroft*, 333 F.3d 964 (9th Cir. 2003), and the majority opinion in our decision in *Daly v. Gonzales*, 129 F. App'x 837 (4th Cir. 2005)(unpublished), both of which held that 8 U.S.C.A. § 1101(a)(22) does not itself provide a means of acquiring U.S. national status, he believed that *Morin* compelled the conclusion that Fernandez is an unremovable U.S. national. The IJ concluded his decision by citing approvingly to the dissenting opinion in *Daly*, which disagreed with the majority's distinguishment of *Morin* based on its criminal context. *See Daly*, 129 F. App'x at 845 (Duncan, J., dissenting) ("I do not agree that the existence of 'different contexts' gives us license to interpret the exact language in [8 U.S.C.A. § 1101(a)(22)] differently in different cases.").

The DHS appealed, and on October 26, 2006, the BIA reversed the IJ's decision and ordered Fernandez removed from the United States. Citing to its recent decision in *Matter of Navas-Acosta*, 23 I. & N. Dec. 586 (BIA 2003), the BIA rejected Fernandez's argument that an alien may become a U.S. national through means other than birth and full naturalization. Also, like the *Daly* majority, the BIA distinguished *Morin* on the basis of its criminal context and thus treated as dicta *Morin*'s interpretation of § 1101(a)(22).

Board Member Filppu filed a concurring opinion in which he expressed skepticism about the Board majority's conclusion that *Morin*'s interpretation of the INA's definition of "national of the United States" is non-binding dicta. Specifically, he stated that "it is unlikely that the criminal law context of *Morin* permits us to construe the same statutory text differently in the case before us." (J.A. at 158.) Nevertheless, Board Member Filppu concurred in the result, for the following reason:

> The Department of Homeland Security is not permitted to seek circuit court review of our decisions and could not obtain Fourth Circuit review of this nationality issue were we to follow *Morin* today. In these highly unusual circumstances, and especially given the unpublished decision in *Daly v. Gonzales*, I believe reversal of the Immigration Judge is warranted in order to seek clarification from the Fourth Circuit as to whether we are to follow *Morin*, despite

our own reading of the statute, which is consistent with substantial circuit law subsequent to *Morin*.

(J.A. at 158 (citation omitted).)

Fernandez timely petitioned for review. We have jurisdiction pursuant to 8 U.S.C.A. § 1252(a)(1) (West 2005) (providing for appellate review of final orders of removal).

## II.

Because this section of the opinion covers substantial ground, we will briefly lay out its course. In Part A, we discuss our decision in *Morin*. In Part B.1., we conclude that we must afford *Chevron* deference to the BIA's interpretation of § 1101(a)(22) and the INA's other nationality provisions. In Part B.2., we discuss the interplay between *Morin*'s interpretation of the INA and the deference that we owe under *Chevron* to the BIA's contrary, post-*Morin* interpretation. We ultimately conclude that *Chevron* dictates that we follow the BIA's interpretation if it is not arbitrary, capricious, or manifestly contrary to the INA. And in Part C, we apply *Chevron* and conclude that the BIA's interpretation, though contrary to *Morin*'s, is a permissible one and thus is entitled to deference.

## A.

Only "aliens" are subject to removal under the INA. *See* 8 U.S.C.A. § 1227(a) (West 2005) (listing "[c]lasses of deportable aliens"). The INA defines "alien" as "any person not a citizen or national of the United States." 8 U.S.C.A. § 1101(a)(3) (West 2005). All citizens of the United States are nationals, but some nationals are not citizens. The INA defines "national of the United States" as "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States." 8 U.S.C.A. § 1101(a)(22). In turn, the word "permanent" is defined to mean "a relationship of continuing or lasting nature, as distinguished from temporary." 8 U.S.C.A. § 1101(a)(31) (West 2005). Congress did not, however, expressly describe the circumstances under which a person demonstrates "a relationship of continuing or lasting nature"

with the United States. In other words, Congress has not specified whether § 1101(a)(22)(B) describes, rather than confers, U.S. nationality.

Fernandez argues that he qualifies as a "national of the United States" under § 1101(a)(22)(B) because he is a noncitizen who owes permanent allegiance to the United States. According to Fernandez, he has demonstrated his permanent allegiance by (1) filing a citizenship application, which required that he swear allegiance to the United States; (2) completing all steps to naturalization except for attending the oath ceremony (a deficiency he attributes to the Government's inaction, not his own negligence); (3) registering for the draft; and (4) living in the United States for over forty years. (Petitioner's Br. at 6-7.) Fernandez believes that, given these facts, our decision in *Morin* compels the conclusion that he is a U.S. national.

*Morin* was a criminal case in which the defendant Morin argued that he had not violated 18 U.S.C.A. § 1958(a), the federal murder-for-hire statute, which requires interstate or foreign travel or use of the mails with an "intent that a murder be committed in violation of the laws of any State or the United States." 18 U.S.C.A. § 1958(a) (West 2000 & Supp. 2006). One such "law of the United States" is 18 U.S.C.A. § 2332(a), which criminalizes the murder of a "national of the United States." 18 U.S.C.A. § 2332(a) (West 2000). Morin argued that he did not violate § 2332(a) because his intended victim was a Mexican citizen and not a "national" of the United States. *Morin*, 80 F.3d at 126. Our attention properly turned to the INA's definition of "national of the United States" because 18 U.S.C.A. § 2331, which defines the terms in § 2332(a), cross-references the INA's definition of "national of the United states." *See* 18 U.S.C.A. § 2331(2) (West 2000 & Supp. 2006) ("[T]he term 'national of the United States' has the meaning given such term in section 101(a)(22) of the Immigration and Nationality Act.").

We rejected the defendant's argument and held that his intended victim was a U.S. national under 8 U.S.C.A. § 1101(a)(22). We reasoned as follows:

> Citizenship . . . is not the sine qua non of "nationality." A "national of the United States" may also be a "person who,

> though not a citizen of the United States, owes permanent allegiance to the United States." 8 U.S.C. § 1101(a)(22). The district court found that because [the intended victim] was a permanent resident alien of the United States who had applied for United States citizenship, he was indeed a "national of the United States." We agree — an application for citizenship is the most compelling evidence of permanent allegiance to the United States short of citizenship itself.

*Morin*, 80 F.3d at 126.

In Fernandez's view, his status as a U.S. national is ironclad in light of *Morin*'s holding that naturalization applicants come within § 1101(a)(22)'s definition of "national of the United States." Just like the Mexican citizen in *Morin*, Fernandez has applied for U.S. citizenship.

### B.

As is apparent from our discussion above, the *Morin* court did not arrive at its construction of § 1101(a)(22) by way of *Chevron*. Thus, it did not address the BIA's 1974 decision in *Matter of Tuitasi*, 15 I. & N. Dec. 102 (BIA 1974), in which the BIA held that the "*acquisition* of nationality for a noncitizen national is not governed by [§ 1101(a)(22)]" but instead by 8 U.S.C.A. § 1408, the provision describing categories of noncitizen nationals. *Id.* at 103 (emphasis in original). The BIA concluded that a noncitizen may become a U.S. national only by completing the naturalization process, by birth to U.S. national parents, or by birth in an outlying possession of the United States. *Id.*

Subsequent to our decision in *Morin*, the BIA has reaffirmed and expounded on its position in its decision in *Navas-Acosta*. Drawing on the historical meaning of the word "national" and the statutory framework of the INA, the BIA held that "nationality under the Act may be acquired only through birth or naturalization." *Id.* at 588. In ordering Fernandez's removal in this case, the BIA has once again adhered to its interpretation, which is contrary to *Morin*'s interpretation that a noncitizen can become a U.S. national merely by filing a naturalization application.

We face two questions in determining whether we must defer under *Chevron* to the BIA's interpretation of the INA's nationality provisions: (1) whether, in the INA, Congress has directed that courts interpret the INA's nationality provisions, including § 1101(a)(22), without affording *Chevron* deference to the BIA's views; and (2) whether we must follow *Morin*'s interpretation of § 1101(a)(22) or the BIA's contrary, post-*Morin* interpretation. We address these questions in turn.

1.

Citing to the Fifth Circuit's decision in *Alwan v. Ashcroft*, 388 F.3d 507 (5th Cir. 2004), Fernandez argues that courts must review claims of nationality de novo without affording *Chevron* deference to the BIA's interpretation of 8 U.S.C.A. § 1101(a)(22). (Petitioner's Br. at 8.) The Government disagrees, urging us to apply *Chevron* in this case and defer to the BIA's interpretation of the INA's nationality provisions.

Acknowledging that courts normally owe deference to the BIA's interpretations of the INA, the *Alwan* court held that it owed no deference to the BIA's determination of nationality claims because Congress, through 8 U.S.C.A. § 1252(b)(5) (West 2005), "explicitly places the determination of nationality claims in the hands of the courts" and thus "has not consigned [them] to the discretion of the BIA." *Id.* at 510. According to the *Alwan* court, § 1252(b)(5) grants courts the power to decide nationality claims irrespective of whether any ambiguity exists in the INA's language that would typically require agency deference. Both the Eleventh and Ninth Circuits have joined in this conclusion that § 1252(b)(5) frees courts from applying *Chevron* in deciding nationality claims. *See Sebastian-Soler v. U.S. Attorney Gen.*, 409 F.3d 1280, 1283 (11th Cir. 2005)(per curiam) (citing § 1252(b)(5) and *Alwan* and not applying *Chevron* to the BIA's interpretation); *Perdomo-Padilla*, 333 F.3d at 967 (citing § 1252(b)(5) as proof that "Congress did not grant discretion to the BIA to decide questions of law related to nationality").

Other circuits have implicitly sanctioned such reasoning, deciding nationality claims without addressing the issue of deference to the BIA. *See Abou-Haidar*, 437 F.3d at 207-08 (interpreting

§ 1101(a)(22)'s definition of "national of the United States" "de novo" without considering the BIA's interpretations); *Marquez-Almanzar*, 418 F.3d at 219 (holding that petitioner was not a "national of the United States" under § 1101(a)(22) without applying *Chevron*: "Our holding is *consistent with* the BIA's own interpretation of the statute . . . and the decisions of other circuits." (emphasis added)(citation omitted)); *see also Salim*, 350 F.3d at 309 n.2 (expressly declining to decide whether *Chevron* deference is due the BIA's determination of questions of law related to nationality claims). It should be noted that, despite not affording deference to the BIA, all of these courts ultimately adopted an interpretation of § 1101(a)(22) similar to the BIA's.

The relevant statutory language, however, does not allow us to ignore the BIA's statutory interpretation. Section 1252(b)(5) provides the following:

> (5)   Treatment of nationality claims
>
> (A)   Court determination if no issue of fact
>
> If the petitioner claims to be a national of the United States and the court of appeals finds from the pleadings and affidavits that no genuine issue of material fact about the petitioner's nationality is presented, the court shall decide the nationality claim.
>
> (B)   Transfer if issue of fact
>
> If the petitioner claims to be a national of the United States and the court of appeals finds that a genuine issue of material fact about the petitioner's nationality is presented, the court shall transfer the proceeding to the district court of the United States for the judicial district in which the petitioner resides for a new hearing on the nationality claim and a decision on that claim as if an action had been brought in the district court under section 2201 of Title 28.
>
> (C)   Limitation on determination

> The petitioner may have such nationality claim decided only as provided in this paragraph.

8 U.S.C.A. § 1252(b)(5).

We cannot conclude, like some of our sister circuits, that the statute calls for us to abandon our normal mode of inquiry — in which we interpret ambiguous provisions of the INA against a *Chevron* backdrop, deferring to the BIA's permissible constructions of the statute — for one that requires us to interpret § 1101(a)(22) sans *Chevron*. We will briefly explain our reasoning.[2]

---

[2]The dissent concludes that *Morin* and *Dragenice v. Gonzales*, 470 F.3d 183 (4th Cir. 2006)(per curiam), bind us by establishing a practice of not affording *Chevron* deference to the BIA on nationality claims. However, in *Morin*, we did not address the question of *Chevron* deference at all. Nor did we need to consider § 1252(b)(5)'s applicability in *Morin*, as it was not a removal case. Similarly, in *Dragenice*, we declined to decide whether birth and naturalization are the exclusive means to becoming a U.S. national [the view espoused by the BIA] because the petitioner's claim of national status failed under either *Morin*'s or the BIA's standard. *Id.* at 188. *Morin* and *Dragenice* thus do not foreclose our application of *Chevron* in this case.

The dissent's protestation that we are creating a conflict with our own precedent in applying *Chevron* — premised on the apparent belief that a previous decision binds the court even by what it *did not do or say* — is thus mistaken. We are bound by holdings, not unwritten assumptions. *See Brecht v. Abrahamson*, 507 U.S. 619, 630-31 (1993) (noting that *stare decisis* is not applicable unless the issue was "squarely addressed" in the prior decision); *Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."); *United States v. Norris*, 486 F.3d 1045, 1054 (8th Cir. 2007) (citing *Sakamoto v. Duty Free Shoppers, Ltd.*, 764 F.2d 1285, 1288 (9th Cir. 1985), for the proposition that "unstated assumptions on non-litigated issues are not precedential holdings binding future decisions"); *Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 113 (2d Cir. 1988) (stating that "a *sub silentio* holding is not binding precedent").

Finally, to the extent that the dissent implies that our analysis hinges (even implicitly) on distinguishing *Morin* on the basis of its criminal context, *see post* at 24-25, this simply is not so. We agree with the dissent that the decision cannot be distinguished based on its context.

The INA provides that "[t]he Secretary of Homeland Security shall be charged with the administration and enforcement of [the statute]" and that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." 8 U.S.C.A. § 1103(a)(1) (West 2005). The Supreme Court has repeatedly stated that "judicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'" *I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (quoting *I.N.S. v. Abudu*, 485 U.S. 94, 110 (1988)). And as the holder of much of the Attorney General's delegated power, "the BIA should be accorded *Chevron* deference as it gives ambiguous statutory terms 'concrete meaning through a process of case-by-case adjudication.'" *Id.* at 425 (quoting *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 448 (1987)). This means that the BIA's interpretations of ambiguous parts of the INA must be given controlling weight unless those interpretations are "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844; *see, e.g.*, *Ahmed v. Ashcroft*, 341 F.3d 214, 217 (3d Cir. 2003) ("We defer to the BIA's interpretation of the [INA] unless the interpretation is arbitrary, capricious, or manifestly contrary to the statute." (internal quotation marks omitted)). For us to remove our *Chevron* glasses in interpreting the INA, the statutory language must make clear that Congress desired such unfettered review.

We do not believe § 1252(b)(5) clearly calls for such a retreat from our mode of review. Rather, the unremarkable statute mandates that when circuit courts — which are ill-equipped to decide genuine disputes of fact — are faced with nationality claims presenting disputed material facts, the proceeding must be transferred to the district court for a hearing. Thus, "[i]n making de novo review by the district court hinge on the existence of genuine issues of material fact, 'Congress intended the language to be interpreted similarly to that in [Federal Rule of Civil Procedure] 56.'" *Jahed v. Acri*, 468 F.3d 230, 234 (4th Cir. 2006)(quoting *Agosto v. I.N.S.*, 436 U.S. 748, 754 (1978)). In carving out nationality claims for this kind of treatment, "Congress was aware of [ ] past [Supreme Court] decisions holding that the Constitution requires that there be some provision for *de novo* judicial determination of claims to American citizenship in deportation proceedings." *Agosto*, 436 U.S. at 753. Such judicial determination of *claims* to nationality is not, however, the same as judicial interpreta-

tion of the *statute* against which such claims are decided. The effects of interpretations of ambiguous statutory provisions, whether by an agency or a court, extend well beyond the individual facts and cases through which such interpretations arise.

This brings us to our second point. In pronouncing that the courts "shall decide the nationality claim," we believe that the statute calls for the same kind of *de novo* review that we always employ when interpreting ambiguous provisions of a statute committed to agency administration. "[T]hat we review legal questions de novo does not detract from the fact that we owe *Chevron* deference to the BIA." *Hughes v. Ashcroft*, 255 F.3d 752, 760 (9th Cir. 2001)(Fernandez, J., concurring in part and dissenting in part)(footnote omitted) (criticizing majority's conclusion that § 1252(b)(5) frees courts from applying *Chevron* to questions of nationality). It is one thing for a court to bring pre-existing statutory interpretations to bear on a specific set of facts, i.e., to decide a claim. It is quite another for a court to give meaning to the ambiguous terms in a statute, which is decidedly *not* the general practice for courts with respect to agency-administered statutes. We think § 1252(b)(5) directs the former, not the latter, which is unremarkable given that we *always* review *legal conclusions* without deference. *See, e.g.*, *Markovski v. Gonzales*, 486 F.3d 108, 110 (4th Cir. 2007) ("Legal conclusions are reviewed without deference; however, an agency's interpretation of the applicable statutes is entitled to deference and must be accepted if reasonable." (internal citation omitted); *see also Nwolise v. I.N.S.*, 4 F.3d 306, 309 (4th Cir. 1993) (same).

In relying on *Alwan*, Fernandez neglects to point out that the Fifth Circuit, considering the effects of amendments made to the INA by the REAL ID Act, Pub. L. No. 109-13, 119 Stat. 231 (2005) ("REAL ID Act"), has called into question *Alwan*'s holding that no *Chevron* deference is afforded to the BIA on questions of nationality. *See Marquez-Marquez v. Gonzales*, 455 F.3d 548, 554 n.12 (5th Cir. 2006). Prior to Congress's enactment of the REAL ID Act, the INA provided that courts did not have jurisdiction to review final orders against aliens removable on the basis of criminal conviction. *See* 8 U.S.C.A. § 1252(a)(2)(C) (West 2004), *amended by* 8 U.S.C.A. § 1252(a)(2)(C) (West 2005) ("Notwithstanding any other provision of law . . . , no court shall have jurisdiction to review any final order

of removal against an alien who is removable by reason of having committed a criminal offense [covered in 8 U.S.C.A. § 1227]."). Because § 1252(a)(2)(C) only barred judicial review of final removal orders against an "alien," a court of appeals' review of the merits of a petitioner's nationality claim often merged with the ultimate question of the court's own jurisdiction to review the removal order at issue. *See, e.g.*, *Lewis v. I.N.S.*, 194 F.3d 539, 542 (4th Cir. 1999) (holding that, notwithstanding § 1252(a)(2)(C)'s jurisdictional bar, court had jurisdiction to consider whether petitioner was an alien and had committed a deportable offense); *Brissett v. Ashcroft*, 363 F.3d 130, 133 (2d cir. 2004) ("The question of whether [petitioner] is an alien whose petition is unreviewable under § 1252(a)(2)(C) is co-extensive with the sole argument that [petitioner] presents in his petition, that he is a citizen and therefore not removable. We therefore have jurisdiction to consider [petitioner's] contention."). In *Marquez-Marquez*, the Fifth Circuit characterized *Alwan*'s no-*Chevron* holding as partly based on the jurisdictional nature of the nationality inquiry in that case (*Alwan*, too, involved a criminal alien). *Marquez-Marquez*, 455 F.3d at 554 n.12 ("In *Alwan* we held that, because our jurisdiction was predicated on § 1252(b)(5)(A) and (C) and we were directed to decide the issue, we hence did not give deference [ ] under *Chevron* . . . to the BIA's legal conclusions respecting the meaning of 'a national of the United States.'").

The REAL ID Act, which became effective on May 11, 2005, and applies retroactively to any removal order, *see* REAL ID Act § 106(b), amended § 1252 in important ways. First, it made petitions for review filed with the courts of appeals "the sole and exclusive means for judicial review" of most removal orders, 8 U.S.C.A. § 1252(a)(5) (West 2005), and expressly eliminated district courts' habeas jurisdiction over removal orders.[3] *Id.* Second, corresponding with the elimination of habeas jurisdiction, the Act expanded courts of appeals' jurisdiction over petitions for review by stating that none of the INA's provisions (including the bar in § 1252(a)(2)(C)) "which

---

[3]Previously, federal courts generally "retain[ed] subject matter jurisdiction over habeas petitions brought by aliens facing removal to the extent that those petitions [were] based on colorable claims of legal error, that is, colorable claims that an alien's statutory or constitutional rights ha[d] been violated." *Carranza v. I.N.S.*, 277 F.3d 65, 71 (1st Cir. 2002).

limit[ ] or eliminate[ ] judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals." 8 U.S.C.A. § 1252(a)(2)(D) (West 2005). This amendment permits all petitioners, including both criminal aliens and non-aliens, to obtain appellate court review of constitutional claims and questions of law through a petition for review. *See Mbea v. Gonzales*, 482 F.3d 276, 278 n.1 (4th Cir. 2007) (observing that, although § 1252(a)(2)(C) "generally bars judicial review of final removal orders when those orders are entered on the ground that the alien committed an aggravated felony or a crime involving moral turpitude, it permits review [of] constitutional claims or questions of law" (internal quotations marks omitted)); *see also Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 394 (5th Cir. 2006) (stating that "§ 1252(a)(2)(D) grants us jurisdiction to hear Petitioner's legal and constitutional claims, regardless of whether he is an alien"); *Jordon v. Attorney Gen.*, 424 F.3d 320, 327 (3d Cir. 2005) (stating that the INA now permits "criminal aliens . . . to obtain review of constitutional claims and questions of law").

In light of the REAL ID Act's granting courts of appeals jurisdiction to review constitutional and legal questions presented by criminal aliens in petitions for review, the *Marquez-Marquez* court questioned *Alwan*'s no-*Chevron* holding given that the holding arose in the context of the *Alwan* court's jurisdiction to consider the petition for review at all. Specifically, the *Marquez-Marquez* court noted that "because [its] jurisdiction no longer turned simply on § 1252(b)(5) but was also supplied by § 1252(a)(2)(D)," it appeared that *Alwan*'s no-*Chevron* conclusion was no longer binding on the court. 455 F.3d at 554 n.12. Although the *Marquez-Marquez* court declined to resolve the *Chevron* deference issue because it would have affirmed the BIA's interpretation "with or without *Chevron* deference," *id.* (internal quotation marks omitted), it is clear that *Alwan*'s resolution of the *Chevron* deference issue may not have survived the REAL ID Act in the Fifth Circuit.

In short, the *Alwan* court's reading of § 1252(b)(5) is not persuasive, and we are convinced that the far better reading is that Congress has directed courts to decide nationality claims *without* altering their normal practice of deciding legal questions against the backdrop of *Chevron*. In fact, nothing in the statute's language suggests that Con-

gress — in passing the statute — intended to alter normal principles of administrative law. Accordingly, we conclude that § 1252(b)(5) directs us to decide nationality claims through our customary mode of inquiry, affording deference to the BIA's interpretation of the INA.

### 2.

There remains the question of whether we must follow *Morin*'s interpretation of § 1101(a)(22) or the BIA's contrary interpretation. Fernandez contends that we must apply *Morin* and declare him to have attained U.S. national status. The Government urges us to defer to the BIA's interpretation and deny Fernandez U.S. national status. Fortunately, the Supreme Court has illuminated our way in its recent decision in *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967 (2005).

In *Brand X*, the Court examined the relationship between the *stare decisis* effect of an appellate court's statutory interpretation and an administrative agency's subsequent, but contrary, interpretation. Reiterating that "*Chevron*'s premise is that it is for agencies, not courts, to fill statutory gaps," the Court concluded that *Chevron*'s application should not "turn on the order in which the [judicial and agency] interpretations issue." *Id.* at 982, 983. Accordingly, the Court held that "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Id.* at 982; *see also Elm Grove Coal Co. v. Director, OWCP*, 480 F.3d 278, 291-95 (4th Cir. 2007) (citing *Brand X* and holding that because the court's relevant precedent did not hold that the statute in question "unambiguously foreclose[d] an agency interpretation," the court was required to defer to the agency's subsequent interpretation if it met the prerequisite for *Chevron* deference, namely, if it was "based on a permissible construction of the statute" (internal quotation marks omitted)).

Of course, *Brand X* in no way calls into doubt our many previous judicial interpretations that rested on the unambiguous words of the statute. *Chevron* step one remains *Chevron* step one after *Brand X*, so that if the court has previously held that Congress has spoken directly

to the precise question at issue, "that is the end of the matter," *Chevron*, 467 U.S. at 842, and no amount of *Chevron* step-two posturing on the part of the agency will undo the court's interpretation.

We thus do not hold that a court must say in so many magic words that its holding is the only permissible interpretation of the statute in order for that holding to be binding on an agency. In many instances, courts were operating without the guidance of *Brand X*, and yet the exercise of statutory interpretation makes clear the court's view that the plain language of the statute was controlling and that there existed no room for contrary agency interpretation. In this instance, however, for the reasons that follow, we do not think that the *Morin* court intended to foreclose all subsequent agency interpretation of § 1101(a)(22).

In interpreting § 1101(a)(22), *Morin* held only that "an application for citizenship is the most compelling evidence of permanent allegiance to the United States short of citizenship itself." *Morin*, 80 F.3d at 126. This interpretation rested on the *Morin* court's implicit, but crucial, interpretation that § 1101(a)(22) confers, rather than describes, nationality, an interpretation that the *Morin* court merely *assumed* was correct without saying anything, one way or the other, about whether the statute dictated such an interpretation. Certainly, *Morin* did not hold that its interpretation flowed from the unambiguous terms of the INA, or that its interpretation was the *only permissible construction* of the statute. The *Morin* court, faced with the question of whether a noncitizen's naturalization application is enough to confer nationality, settled upon what it thought was, at the least, a sensible construction of "national of the United States," but it did not hold that its interpretation was the only one possible. *See Brand X*, 545 U.S. at 985 ("Before a judicial construction of a statute, whether contained in a precedent or not, may trump an agency's, the court must hold that the statute unambiguously requires the court's construction."). Consequently, *Morin* must yield to a reasonable interpretation by the BIA of the INA and its provisions regarding U.S. nationality, including § 1101(a)(22).

## C.

We thus turn to our application of *Chevron*. As our earlier discussion suggests, "Congress has not directly addressed the precise ques-

tion at issue" here, *Chevron*, 467 U.S. at 843, because the INA does not provide express guidance as to the circumstances under which a person "owes permanent allegiance to the United States." *See Dragenice v. Gonzales*, 470 F.3d 183, 187 (4th Cir. 2006)(per curiam) ("Congress provided no explicit guidance . . . as to the circumstances under which a person 'owes permanent allegiance to the United States.'"); *see also* Maximilian Koessler, *"Subject," "Citizen," "National," and "Permanent Allegiance"*, 56 Yale L. J. 58, 69 (1946)(noting that "permanent allegiance" "has become a mystic concept which dims, instead of clarifying, definitions" of nationality). Accordingly, the BIA possesses whatever degree of discretion the statutory ambiguity allows, and we must defer to its interpretation of § 1101(a)(22) if that interpretation is a "permissible construction of the statute." *Chevron*, 467 U.S. at 843. As noted above, because Congress has not merely failed to address a precise question but has also made an explicit delegation of rulemaking authority to the agency, "the agency's regulation is 'given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute.'" *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 239 (2004)(quoting *Chevron*, 467 U.S. at 844)(alteration in original).

The BIA's position, expressed in both this case and its post-*Morin* decision in *Navas-Acosta*, is that one acquires U.S. nationality only by birth or naturalization. *See Navas-Acosta*, 23 I. & N. at 588. A brief recounting of the historical and textual bases for the BIA's interpretation reveals that this construction is undoubtedly a permissible one.

1.

Historically, the term "national" has referred only to noncitizens born in territories of the United States. *Oliver v. U.S. Dep't of Justice, I.N.S.*, 517 F.2d 426, 427-28 n.3 (2d Cir. 1975). The term "was originally intended to account for the inhabitants of certain territories - territories said to 'belong to the United States,' including the territories acquired from Spain during the Spanish-American War, namely the Philippines, Guam, and Puerto Rico." *Marquez-Almanzar*, 418 F.3d at 218 (citing 7 Charles Gordon *et al.*, *Immigration Law and Procedure*, § 91.01[3][b] (2005)); *see also Rabang v. I.N.S.*, 35 F.3d 1449, 1452 n.5 (9th Cir. 1994) (noting that the "term 'national' came into

popular use in this country when the United States acquired territories outside its continental limits, and was used in reference to noncitizen inhabitants of those territories"). Nationals "were deemed to owe 'permanent allegiance' to the United States" and were "recognized as members of the nationality community in a way that distinguished them from aliens." *Marquez-Almanzar*, 418 F.3d at 218.

"The phrase 'owes permanent allegiance' in § 1101(a)(22)(B) is thus a term of art that denotes a legal status for which individuals have never been able to qualify by demonstrating permanent allegiance, as that phrase is colloquially understood." *Id.* In this regard, the INA's definition of nationality, "which explain[s] the latter by referring to 'permanent allegiance,' [is] tautological," for "permanent allegiance" is simply a "synonym for nationality."[4] Koessler, *supra*, at 69 & n.68.

The historical understanding of the term "national" thus supports the BIA's interpretation.

### 2.

The text and structure of the INA also support the BIA's interpretation of § 1101(a)(22), and on many different sides.

Section 1101(a)(22), the provision defining "national of the United States," is a subsection of 8 U.S.C.A. § 1101(a), which defines numerous terms as they are used throughout Chapter 12 of Title 8 of the U.S. Code. Elsewhere in Chapter 12, the INA describes four categories of persons who are classified as "nationals, but not citizens, of the United States at birth." 8 U.S.C.A. § 1408 (West 2005). These categories include persons who were born in an "outlying possession of

---

[4]Given the gradual extension of U.S. citizenship rights to the native inhabitants of the United States' insular possessions, the distinction between citizenship and noncitizen nationality is of less significance today. In the early twentieth century, however, the distinction was an important one, for "[m]any of our insular possessions were not regarded as fully incorporated into the United States, and their inhabitants were not accorded full rights of citizenship." *Marquez-Almanzar v. I.N.S.*, 418 F.3d 210, 218 n. 12 (2d Cir. 2005).

the United States," 8 U.S.C.A. § 1408(1), who were "found" in an "outlying possession" at a young age, *id.* § 1408(3), or who are the children of noncitizen nationals, *see id.* §§ 1408(2), (4).[5] There is no other provision in the INA besides § 1408 that categorizes noncitizen nationals. Given § 1101(a)(2)'s placement in a definitional section of the INA and § 1408's description of the categories of noncitizens who become nationals at birth, a straightforward understanding of the provisions' relationship is that § 1408 establishes a category of persons who qualify as noncitizen nationals and that those who qualify are in turn described in § 1101(a)(22) as owing "permanent allegiance" to the United States.[6] The BIA has thus stated that "whether one 'owes

[5]The INA provides that "[t]he term 'outlying possessions of the United States' means American Samoa and Swains Island." 8 U.S.C.A. § 1101(a)(29) (West 2005).

[6]The parties have expressed some confusion over whether the Supreme Court in *Miller v. Albright*, 523 U.S. 420 (1998), has adopted the historical view of nationality, albeit in dicta. For example, consider this paragraph from Fernandez's opening brief: "Neither the Supreme Court nor the Court of Appeals for the Fourth Circuit has decided this issue, although the Supreme court *in dicta* has implicitly accepted the traditional view that 'nationals' are noncitizen residents of U.S. territories." (Petitioner's Br. at 11.)(emphasis in original)(citing *Miller v. Albright*, 523 U.S. 420, 465 n.2 (1998) (Ginsburg, J., dissenting)). Of course, the reference focused on by the parties is not dicta of the Supreme Court, for it is part of Justice Ginsburg's *dissenting* opinion in that case.

In *Miller*, the Supreme Court faced a constitutional challenge to 8 U.S.C.A. § 1409 (West 2005), which provides, among other things, that a child born out of wedlock and outside the United States to an alien mother and an American father must be legitimated before age eighteen to acquire citizenship. The petitioner, a child born abroad to an American father and an alien mother, had been denied citizenship because she was not legitimated before eighteen. She argued that § 1409 is unconstitutional under the Equal Protection Clause of the Fifth Amendment because it differentiates between citizen fathers and citizen mothers and thus utilizes a suspect classification - gender - without justification. *Miller*, 523 U.S. at 424. The Court affirmed the D.C. Circuit's decision upholding the statute, but Justice Stevens's opinion announcing the judgment and squarely rejecting the constitutional challenge was joined only by Chief Justice Rehnquist. Both Justice O'Connor, joined by Justice Kennedy, and Justice Scalia, joined by Justice Thomas, wrote opinions

permanent allegiance to the United States,' is not simply a matter of individual choice"; instead the phrase "reflects a legal relationship between an individual and a sovereign." *Navas-Acosta*, 23 I. & N. at 587-88; *see also Marquez-Almanzar*, 418 F.3d at 217 ("[T]he term "permanent allegiance" merely describes the nature of the relationship between non-citizen nationals and the United States, a relationship that has already been created by another statutory provision.").

The INA's elaborate framework for attaining nationality through naturalization also supports the BIA's view. Section 1101(a)(23), the statutory provision immediately following the definition of "national of the United States," provides that "'naturalization' means the conferring of nationality of a state upon a person after birth, by any means whatsoever." 8 U.S.C.A. § 1101(a)(23) (West 2005). On its face, § 1101(a)(23) "makes no provision for the attainment of nationality short of full naturalization." *Perdomo-Padilla*, 333 F.3d at 969. Our review of the INA section entitled "Nationality Through Naturalization," 8 U.S.C.A. §§ 1421-1458 (West 2005 & Supp. 2006), lends support to the conclusion that "Congress [did not] even remotely indicate that a demonstration of 'permanent allegiance' alone would allow, much less require, the Attorney General to confer U.S. national status on an individual." *Marquez-Almanzar*, 418 F.3d at 218.

---

concurring in the judgment, with Justice O'Connor concluding that the petitioner lacked third-party standing to challenge the statute on her father's behalf, *see id.* at 445-46, and Justice Scalia concluding that the Court had no power to grant the relief requested: conferral of citizenship on a basis other than that prescribed by Congress, *see id.* at 452-53.

In a dissenting opinion joined only by Justices Souter and Breyer, Justice Ginsburg stated that she believed the statute to unconstitutionally classify on the basis of gender in determining the capacity of a parent to qualify a child for citizenship. *Id.* at 460. As part of her discussion of the history of U.S. citizenship laws, Justice Ginsburg stated that the distinction between citizenship and nationality "has little practical impact today . . . for the only remaining noncitizen nationals are residents of American Samoa and Swains Island." *Id.* at 467 n.2. This is the statement at the center of the confusion, but the confusion is easily dispelled. This statement, made in a footnote in a dissenting opinion, certainly is not binding on us in this case. We do, however, note that it comports with the BIA's interpretation of the INA.

The textual support for the BIA's interpretation does not end there. An interpretation of § 1101(a)(22) that confers U.S. national status on naturalization applicants is difficult to reconcile with 8 U.S.C.A. § 1429, which establishes "the primacy of removal proceedings over a naturalization application." *Navas-Acosta*, 23 I. & N. at 588. Specifically, § 1429 provides that "no person shall be naturalized against whom there is outstanding a final finding of deportability . . . and no application for naturalization shall be considered by the Attorney General if there is pending against the applicant a removal proceeding." 8 U.S.C.A. § 1429 (West 2005). Because the INA permits the removal of aliens only, and § 1429 permits the removal of persons with pending naturalization applications, it seems clear that Congress understood applicants for naturalization to be aliens and not nationals.[7] *See Perdomo-Padilla*, 333 F.3d at 970 (reaching same conclusion).

Finally, the BIA's interpretation also finds strong support in the language of 8 U.S.C.A. § 1481 (West 2005). That provision sets forth a number of ways by which a "person who is a national of the United States *whether by birth or naturalization*, shall lose his nationality." 8 U.S.C.A. § 1481 (emphasis added). The BIA has concluded that "[i]f a person could acquire nationality through any means other than birth or naturalization, . . . Congress would have included it in this provision." *Navas-Acosta*, 23 I. & N. at 588.

In summary, there is no dearth of support for the BIA's interpretation of the INA and its definition of "national of the United States." The BIA's position that a noncitizen may only acquire U.S. nationality by birth or by completing the naturalization process easily fits with both the historical meaning of the term "national" of the United States and the text and structure of the INA. As noted earlier, putting aside

---

[7]In view of 8 U.S.C.A. § 1429, we agree with the *Perdomo-Padilla* court that categorizing naturalization applicants as U.S. nationals would handcuff the DHS in "cases in which a person files a naturalization application after the [DHS] has instituted removal proceedings." *Perdomo-Padilla v. Ashcroft*, 333 F.3d 964, 970 (9th Cir. 2003). Under Fernandez's view, if a person filed a naturalization application after the DHS has begun removal proceedings, the person would thereby become a "national" and the DHS would not be permitted to complete the removal proceedings. This result runs counter to the plain language of § 1429.

*Morin*, every court of appeals to have addressed this issue has reached a similar conclusion to the BIA. *See Abou-Haidar*, 437 F.3d at 207-08 (holding that a naturalization application cannot confer national status on an alien because one can become a U.S. national only by birth or full naturalization); *Marquez-Almanzar*, 418 F.3d at 217-19 (same); *Sebastian-Soler*, 409 F.3d at 1287 (same); *Salim*, 350 F.3d at 310 (same); *Perdomo-Padilla*, 333 F.3d at 972 (same). Because the BIA's interpretation of the INA's definition of "national of the United States" is not "arbitrary, capricious, or manifestly contrary to the statute," *Chevron*, 467 U.S. at 844, we must defer to it in this case, *Morin* notwithstanding.[8]

### III.

For the foregoing reasons, we conclude that principles of *Chevron* deference control this case. The BIA's conclusion that Fernandez is not a "national of the United States" rests on its permissible construction of the INA, the statute that it has been granted substantial delegated power to interpret. Under the BIA's view, U.S. national status vests either at the moment of birth or at the moment of citizenship. Both of these moments elude Fernandez. Accordingly, we deny his petition for review.

---

[8]Any quarrel with our decision on the ground that we are permitting the BIA to overrule *Morin* has been squarely answered by the Supreme Court:

> Since *Chevron* teaches that a court's opinion as to the best reading of an ambiguous statute an agency is charged with administering is not authoritative, the agency's decision to construe the statute differently from a court does not say that the court's holding was legally wrong. Instead, the agency may, consistent with the court's holding, choose a different construction, since the agency remains the authoritative interpreter (within the limits of reason) of such statutes. In all other respects, the court's prior ruling remains binding law (for example, as to agency interpretations to which *Chevron* is inapplicable).

*Nat'l Cable Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 983 (2005).

*PETITION FOR REVIEW DENIED*

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

With respect, I dissent.

In *United States v. Morin*, 80 F.3d 124 (4th Cir. 1996), this court unanimously held that "national of the United States" as defined by 8 U.S.C.A. § 1101(a)(22)(B) (West 2005) includes naturalization applicants. The majority acknowledges this, as it must. *See ante* at 6-7. Thus, the majority recognizes, albeit implicitly, that *Morin* constitutes binding circuit precedent. It refuses to follow this precedent because it believes that we must apply *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) deference to the BIA's contrary interpretation of § 1101(a)(22). I cannot agree and so must dissent. Given our recent precedent, we must interpret § 1101(a)(22) without applying *Chevron* deference to the agency's interpretation. Therefore, we must conclude that applications for citizenship demonstrate permanent allegiance and that Luis Puentes Fernandez is a national under § 1101(a)(22). *See Morin*, 80 F.3d at 126. For this reason I would grant Fernandez's petition for review.

In reaching its holding, the majority heavily relies on *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967 (2005). But, *Brand X* only governs if "*Chevron*'s framework" applies, *id.* at 980 — if the agency is "otherwise entitled to *Chevron* deference," *id.* at 982. Courts must accord an administrative agency *Chevron* deference only if Congress has delegated authority to the agency to clarify a statutory ambiguity. *Bustamente-Barrera v. Gonzales*, 447 F.3d 388, 393 (5th Cir. 2000). Congress has not done so here, and until today no court has held that it has.

Although some of our sister circuits have disagreed with *Morin*'s interpretation of § 1101(a)(22), every court that has reached the question has held — either explicitly or implicitly — that courts owe no *Chevron* deference to the BIA's interpretation of that statute. *See Abou-Haidar v. Gonzales*, 437 F.3d 206, 207-08 (1st Cir. 2006); *Marquez-Almanzar v. INS*, 418 F.3d 210, 219 (2d Cir. 2005); *Sebastian-Soler v. U.S. Attorney Gen.*, 409 F.3d 1280, 1283 (11th Cir. 2005) (per curiam); *Alwan v. Ashcroft*, 388 F.3d 507, 510 (5th Cir.

2004); *Perdomo-Padilla v. Ashcroft*, 333 F.3d 964, 967 (9th Cir. 2003); *see also Hughes v. Ashcroft*, 255 F.3d 752, 755-58 (9th Cir. 2001); *cf. United States v. Jimenez-Alcala*, 353 F.3d 858, 861 (10th Cir. 2003) (adopting Ninth Circuit view of the term "national" in a criminal case without discussion of *Chevron*). True, one circuit has declined to resolve that question, *see Salim v. Ashcroft*, 350 F.3d 307, 309 n.2 (3d Cir. 2003) (per curiam), and one has briefly questioned its earlier explicit holding, *see Marquez-Marquez v. Gonzales*, 455 F.3d 548, 554 n.12 (5th Cir. 2006). But before the majority's ruling today, no court has ever held that *Chevron* deference applies to the BIA's interpretation of "national" in § 1101(a)(22).

There is good reason for this unanimity. As our sister circuits have reasoned, "the BIA's interpretation is not entitled to [*Chevron*] deference" because in the removal context Congress has placed "determination of nationality claims solely in the hands" of the courts. *Perdomo-Padilla*, 333 F.3d at 967; *see also*, *Sebastian-Soler*, 409 F.3d at 1283. The Immigration and Nationality Act explicitly directs that a "court shall decide the nationality claim." 8 U.S.C.A. § 1252(b)(5)(A) (West 2005). This provision is followed by the limitation that "[t]he petitioner may have such nationality claim decided only as provided in this paragraph." 8 U.S.C.A. § 1252(b)(5)(C) (West 2005); *see also*, *Perdomo-Padilla*, 333 F.3d at 967 (citing statute and holding that "Congress did not grant discretion to the BIA to decide questions of law related to nationality"); *accord Alwan*, 388 F.3d at 510; *Hughes*, 255 F.3d at 758.

The majority's holding not only creates a conflict with at least four other circuits, it also conflicts with our own precedent. In *Morin*, we too implicitly concluded that the *Chevron* framework did *not* apply to determinations of nationality and so interpreted § 1101(a)(22) without considering the BIA's views. Although *Morin* defined "national" in the criminal context, we most assuredly cannot interpret the same statute differently in different cases. *See Perdomo-Padilla*, 333 F.3d at 972 (refusing in removal case to distinguish *Morin* on basis of criminal context). Moreover, in *Dragenice v. Gonzales*, 470 F.3d 183, 187-89 (4th Cir. 2006), we recently interpreted § 1101(a)(22)'s definition of "national" *in the immigration context* without affording *Chevron* deference or even considering BIA decisions.

I would follow our sister circuits and our own precedent in *Morin* and *Dragenice* and decline to apply *Chevron* deference here. I fear that the majority's disagreement with *Morin*'s interpretation of § 1101(a)(22) has led it to defer to the BIA on nationality questions that Congress has entrusted to the judiciary.