**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1522**

FREDERICK L. ALLEN; NAUTILUS PRODUCTIONS, LLC,

        Plaintiffs - Appellees,

v.

ROY A. COOPER, III, as Governor of North Carolina; SUSI H. HAMILTON, Secretary of the North Carolina Department of Natural and Cultural Resources, in her official capacity; SUSAN WEAR KLUTTZ, former Secretary of the North Carolina Department of Natural and Cultural Resources, individually; D. REID WILSON, Chief Deputy Secretary of the North Carolina Department of Natural and Cultural Resources, in his official capacity; KARIN COCHRAN, former Chief Deputy Secretary of the North Carolina Department of Natural and Cultural Resources, individually; KEVIN CHERRY, Deputy Secretary of the North Carolina Department of Natural and Cultural Resources, individually and in his official capacity; G. NEEL LATTIMORE, Director of Communications of the North Carolina Department of Natural and Cultural Resources, in his official capacity; CATHERINE A. OLIVA, Director of Marketing of the North Carolina Department of Natural and Cultural Resources, in her official capacity; CARY COX, former Assistant Secretary, Marketing and Communications of the North Carolina Department of Natural and Cultural Resources, individually; STEPHEN R. CLAGGETT, a/k/a Steve Claggett, State Archaeologist, individually and in his official capacity; JOHN W. MORRIS, a/k/a Billy Ray Morris, Deputy State Archaeologist - Underwater and Director of the Underwater Archaeology Branch of the North Carolina Department of Natural and Cultural Resources, individually and in his official capacity; NORTH CAROLINA DEPARTMENT OF NATURAL AND CULTURAL RESOURCES; STATE OF NORTH CAROLINA,

        Defendants - Appellants,

and

FRIENDS OF QUEEN ANNE'S REVENGE, A NON-PROFIT CORPORATION,

Defendant.

------------------------------

THE COPYRIGHT ALLIANCE; RALPH OMAN,

Amici Supporting Appellees.

No. 17-1602

FREDERICK L. ALLEN; NAUTILUS PRODUCTIONS, LLC,

Plaintiffs - Cross-Appellants,

v.

ROY A. COOPER, III, as Governor of North Carolina; SUSI H. HAMILTON, Secretary of the North Carolina Department of Natural and Cultural Resources, in her official capacity; SUSAN WEAR KLUTTZ, former Secretary of the North Carolina Department of Natural and Cultural Resources, individually; D. REID WILSON, Chief Deputy Secretary of the North Carolina Department of Natural and Cultural Resources, in his official capacity; KARIN COCHRAN, former Chief Deputy Secretary of the North Carolina Department of Natural and Cultural Resources, individually; KEVIN CHERRY, Deputy Secretary of the North Carolina Department of Natural and Cultural Resources, individually and in his official capacity; G. NEEL LATTIMORE, Director of Communications of the North Carolina Department of Natural and Cultural Resources, in his official capacity; CATHERINE A. OLIVA, Director of Marketing of the North Carolina Department of Natural and Cultural Resources, in her official capacity; CARY COX, former Assistant Secretary, Marketing and Communications of the North Carolina Department of Natural and Cultural Resources, individually; STEPHEN R. CLAGGETT, a/k/a Steve Claggett, State Archaeologist, individually and in his official capacity; JOHN W. MORRIS, a/k/a Billy Ray Morris, Deputy State Archaeologist - Underwater and Director of the Underwater Archaeology Branch of the North Carolina Department of Natural and Cultural Resources, individually and in his official capacity; NORTH CAROLINA DEPARTMENT OF NATURAL AND CULTURAL RESOURCES; STATE OF NORTH CAROLINA,

Defendants - Cross-Appellees,

and

FRIENDS OF QUEEN ANNE'S REVENGE, A NON-PROFIT CORPORATION,

Defendant.

---

Appeals from the United States District Court for the Eastern District of North Carolina, at Raleigh.  Terrence W. Boyle, District Judge.  (5:15-cv-00627-BO)

---

Argued:  March 20, 2018                                        Decided:  July 10, 2018

---

Before NIEMEYER and KING, Circuit Judges, and Leonie M. BRINKEMA, United States District Judge for the Eastern District of Virginia, sitting by designation.

---

Reversed and remanded with instructions by published opinion.  Judge Niemeyer wrote the opinion, in which Judge King and Judge Brinkema joined.

---

**ARGUED:**  Ryan Y. Park, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellants/Cross-Appellees.  Susan Freya Olive, OLIVE & OLIVE, P.A., Durham, North Carolina, for Appellees/Cross-Appellants.  Andrew Michael Gass, LATHAM & WATKINS LLP, San Francisco, California, for Amicus Ralph Oman.  **ON BRIEF:**  Josh Stein, Attorney General, Matthew W. Sawchak, Solicitor General, Amar Majmundar, Senior Deputy Attorney General, Olga E. Vysotskaya de Brito, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellants/Cross-Appellees. G. Jona Poe, Jr., POE LAW FIRM, PLLC, Durham, North Carolina; David L. McKenzie, OLIVE & OLIVE, P.A., Durham, North Carolina, for Appellees/Cross-Appellants.  Kelly M. Klaus, MUNGER, TOLLES & OLSON LLP, San Francisco, California, for Amicus Copyright Alliance.  Perry J. Viscounty, Allison S. Blanco, Costa Mesa, California, Jennifer L. Berry, San Diego, California, Patrick K. O'Brien, LATHAM & WATKINS LLP, San Francisco, California, for Amicus Ralph Oman.

---

NIEMEYER, Circuit Judge:

Frederick Allen, a videographer, and Nautilus Productions, LLC, Allen's video production company, commenced this action, which, at its core, alleges that North Carolina, its agencies, and its officials (collectively, "North Carolina") violated Allen's copyrights by publishing video footage and a still photograph that Allen took of the 18th-century wreck of a pirate ship that sank off the North Carolina coast. Allen and Nautilus obtained the rights to create the footage and photograph through a permit issued by North Carolina to the ship's salvors, and Allen subsequently registered his work with the U.S. Copyright Office. Allen and Nautilus also seek to declare unconstitutional a 2015 state law — N.C. Gen. Stat. § 121-25(b) (providing that photographs and video recordings of shipwrecks in the custody of North Carolina are public records) — which Allen and Nautilus claim was enacted in bad faith to provide the State with a defense to their federal copyright infringement action.

North Carolina filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), asserting sovereign immunity under the Eleventh Amendment, qualified immunity, and legislative immunity. North Carolina's claim of sovereign immunity prompted Allen and Nautilus to argue (1) that in a 2013 Settlement Agreement, North Carolina waived sovereign immunity; (2) that in any event the federal Copyright Remedy Clarification Act of 1990 had abrogated the State's sovereign immunity; and (3) that as to their claims for injunctive relief, *Ex parte Young* provided an exception to sovereign immunity for ongoing violations of federal law.

4

The district court rejected North Carolina's claims of immunity, and North Carolina filed this interlocutory appeal. Allen and Nautilus filed a cross-appeal. For the reasons that follow, we reverse and remand with instructions to dismiss *with prejudice* the claims against the state officials in their individual capacities and to dismiss *without prejudice* the remaining claims.

I

In 1717, the pirate Edward Teach, better known as Blackbeard, captured a French merchant vessel and renamed her *Queen Anne's Revenge*. Teach armed the *Revenge* with 40 cannons and made her his flagship. But the following year, the *Revenge* ran aground about a mile off the coast of Beaufort, North Carolina, and Teach abandoned her. Under state law, the ship and its artifacts later became the property of North Carolina and subject to its "exclusive dominion and control." N.C. Gen. Stat. § 121-22.

More than two-and-a-half centuries later, on November 21, 1996, Intersal, Inc., a private research and salvage firm operating under a permit issued by North Carolina, discovered the wreck of the *Revenge,* and on September 1, 1998, Intersal, along with Maritime Research Institute, Inc., an affiliated entity, entered into a 15-year salvage agreement with the North Carolina Department of Natural and Cultural Resources ("the Department"). Under the agreement, Intersal and Maritime Research acknowledged North Carolina's ownership of the shipwreck and the ship's artifacts, and North Carolina acknowledged Intersal's and Maritime Research's salvage rights, agreeing that Intersal

and Maritime Research could retain a designated portion of the financial proceeds arising from the sale of media relating to the *Revenge* and replicas of its artifacts.

As relevant to this case, the agreement provided that:

> Except as provided in paragraph 20 and this paragraph, Intersal shall have the exclusive right to make and market all commercial narrative (written, film, CD Rom, and/or video) accounts of project related activities undertaken by the Parties.

The agreement, however, made an exception for the creation of a "non commercial educational video and/or film documentary" and provided that the parties would cooperate in making such an educational documentary. And Paragraph 20 provided:

> The Department shall have the right to authorize access to, and publish accounts and other research documents relating to, the artifacts, site area, and project operations for non commercial educational or historical purposes. Nothing in this document shall infringe to any extent the public's right to access public records in accordance with Chapters 121 and 132 of the General Statutes of North Carolina.

The agreement also provided:

> [Maritime Research], Intersal and the Department agree to make available for duplication by each other, or, when appropriate, to provide the Department with, relevant field maps, notes, drawings, photographic records and other such technical, scientific and historical documentation created or collected by [Maritime Research], Intersal or the Department pursuant to the study of the site and the recovery of materials therefrom. These materials shall become public records curated by the Department.

Following execution of this salvage agreement, Intersal retained Nautilus, Allen's production company, to document the salvage of the *Revenge*, and under that arrangement, Allen accumulated, as he alleged in the complaint, "a substantial archive of video and still images showing the underwater shipwreck and the efforts of teams of divers and archaeologists to recover various artifacts from [it]." Allen registered 13

6

copyrights in these materials with the U.S. Copyright Office, each copyright covering a year's worth of footage.

In 2013, Allen and Nautilus took the position that the Department's publication of Allen's work on the Internet without his consent infringed Allen's copyrights, and this prompted a dispute leading ultimately to a settlement agreement dated October 15, 2013, to which the Department, Intersal, Nautilus, and Allen were parties. In that agreement, none of the parties admitted to any wrongdoing but agreed to the clarification of preexisting arrangements so that the salvage operation could continue.

The 2013 Settlement Agreement divided Allen and Nautilus's video and photographic documentation, treating some of the footage as "commercial documentaries" and some as "non-commercial media," for purposes of clarifying the parties' respective rights. With respect to "commercial documentaries," the 2013 Settlement Agreement provided:

> Intersal, through Nautilus, has documented approximately fifteen (15) years of underwater and other activities related to the QAR [*Queen Anne's Revenge*] project. For purposes of this Commercial Documentaries section, Intersal represents to [the Department] that Nautilus Productions shall remain Intersal's designee. Intersal shall have the exclusive right to produce a documentary film about the [*Revenge*] project for licensing and sale. Intersal may partner with [the Department] if it chooses to do so. . . . If [the Department] and Intersal do not partner to make a documentary, the Intersal documentary script shall be reviewed by [the Department] for historical accuracy prior to final release by Intersal or its agents. Intersal agrees to allow [the Department] to use its completed documentary, free of charge, in its museums and exhibits for educational purposes.

With respect to "non-commercial media," the Agreement provided in relevant part:

> All non-commercial digital media, regardless of producing entity, shall bear a time code stamp, and watermark (or bug) of Nautilus and/or [the

7

Department], as well as a link to [the Department], Intersal, and Nautilus websites, to be clearly and visibly displayed at the bottom of any web page on which the digital media is being displayed.

[The Department] agrees to display non-commercial digital media only on [the Department's] website.

As to Nautilus's archival footage, the Agreement provided that archival footage and photographs that did not "bear a time code stamp and a Nautilus Productions watermark (or bug)" would be returned to Nautilus. But it also provided that the Department could "retain, for research purposes, archival footage, still photographs, and other media that contain a time code stamp and watermark [or bug], and as to such media [the Department] [would] provide Nautilus with a current, accurate list."

Finally, the 2013 Settlement Agreement addressed the video footage and still photographs as public records, providing:

Nothing in this Agreement shall prevent [the Department] from making records available to the public pursuant to North Carolina General Statutes Chapters 121 and 132, or any other applicable State or federal law or rule related to the inspection of public records.

During the recovery phase of the [*Revenge*] project, [the Department] and Intersal agree to make available to each other records created or collected in relation to the [*Revenge*] project. The entity requesting copies bears the cost of reproduction. Within one (1) year after the completion of the recovery phase, Intersal shall allow [the Department] to accession duplicate or original records that were created or collected by Intersal during the project and that are related to the site, or the recovery or conservation of the [*Revenge*] materials. Such records shall include relevant field maps, notes, drawings, photographic records, and other technical, scientific and historical documentation created or collected by [the Department] or Intersal pursuant to the study of the site and the recovery of materials therefrom. These materials shall become public records curated by [the Department]. All digital media provided by Intersal under the terms of this paragraph shall include a time code stamp and watermarks (or bugs).

8

Following execution of the 2013 Settlement Agreement, as Allen and Nautilus alleged in their complaint, the Department "resumed infringing [Allen's] copyrights" by "publish[ing] . . . and/or display[ing]" various "works" on the Internet. The complaint identified six "infringing works" along with their Internet addresses. Five of those works were videos about the *Revenge* shipwreck that were posted on the Department's YouTube channel, and the remaining "infringing work" was a newsletter about North Carolina's maritime museums, which contained an article about the *Revenge* with one of Allen's still photographs. Accordingly, Allen and Nautilus sent North Carolina a "Takedown Notice," and North Carolina maintained that it complied before the hearing on its motion to dismiss filed in the district court. It provided the district court with documentary evidence confirming that fact, and at oral argument on this appeal, counsel for Allen and Nautilus also confirmed that the six alleged infringements had ceased.

Allen and Nautilus commenced this action in December 2015, naming as defendants the State of North Carolina, the Department, the Governor, and six officials in the Department, among others. Except for the Governor, who was sued only in his official capacity, each of the individual defendants was sued in both his or her official and individual capacities. The complaint, as amended, contained five counts. In Count I, Allen and Nautilus alleged that in 2015, the defendants enacted N.C. Gen. Stat. § 121-25(b) (making shipwreck videos and photographs in North Carolina's custody public records) in bad faith to "create a defense" to the copyright infringement claim asserted in Count II. They sought a declaratory judgment that § 121-25(b) was unenforceable because it was preempted by federal copyright law and was otherwise unconstitutional

9

under the Takings Clause and Due Process Clause of the Constitution. In Count II, Allen and Nautilus claimed copyright infringement under 17 U.S.C. § 501(a)–(b). In Count III, they alleged that the defendants "acted under color of state law to enact § 121-25(b) and to threaten plaintiffs . . . with enforcement thereof," in violation of 42 U.S.C. § 1983. Finally, in Counts IV and V, they alleged state law claims for unfair trade practices and civil conspiracy. For relief, Allen and Nautilus sought, in addition to the declaratory judgment sought in Count I, an order enjoining copyright infringement and enforcement of § 121-25(b), as well as compensatory, statutory, treble, and punitive damages.

North Carolina filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), maintaining that the institutional defendants and individual defendants in their official capacities were shielded from suit in federal court by sovereign immunity under the Eleventh Amendment and that the officials sued in their individual capacities were entitled to qualified and legislative immunity. Allen and Nautilus responded to the claim of sovereign immunity, arguing (1) that North Carolina waived sovereign immunity in the 2013 Settlement Agreement; (2) that North Carolina's sovereign immunity was also abrogated by the federal Copyright Remedy Clarification Act of 1990, 17 U.S.C. § 511; (3) and that, in any event, injunctive relief was available under *Ex parte Young*, 209 U.S. 123 (1908). They also argued that the individual officials could not invoke qualified immunity because reasonable officials under the circumstances alleged would have known that they were violating Allen's rights under federal copyright law, and that they could not invoke legislative immunity because none of the officials had performed any legislative functions.

10

Following a hearing, the district court, by order dated March 23, 2017, denied North Carolina's motion to dismiss as to Counts I and II, concluding that its Eleventh Amendment immunity for those counts was validly abrogated by the Copyright Remedy Clarification Act; that the state officials sued in their individual capacities were not entitled to qualified immunity; and that a determination of those officials' legislative immunity would be "premature" at that time. It granted the motion as to the remaining counts on the basis of sovereign immunity.

From the district court's interlocutory order, North Carolina filed this appeal, challenging the district court's denial of immunity in all forms. *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 141 (1993) (recognizing the right to interlocutory appeal of an order denying sovereign immunity); *Occupy Columbia v. Haley*, 738 F.3d 107, 115 (4th Cir. 2013) (same as to qualified immunity); *England v. Rockefeller*, 739 F.2d 140, 142 (4th Cir. 1984), *overruled on other grounds by Young v. Lynch*, 846 F.2d 960 (4th Cir. 1988) (same as to legislative immunity). Allen and Nautilus cross-appealed, challenging several of the district court's specific conclusions regarding sovereign immunity.

II

Invoking the Eleventh Amendment, North Carolina and its officials acting in their official capacities claim that they are immune from suit in federal court, *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–01 (1984); *Kentucky v. Graham*, 473 U.S. 159, 169 (1985), and they contend that the immunity applies regardless of the form

11

of relief sought by the plaintiffs, *see Pennhurst*, 465 U.S. at 101–02, 114 n.25; *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 58 (1996).

Allen and Nautilus disagree, arguing that North Carolina waived sovereign immunity when it signed the 2013 Settlement Agreement; that the State's sovereign immunity was abrogated by the federal Copyright Remedy Clarification Act; and that, in any event, *Ex parte Young* provides them with an exception for the injunctive relief they request as to ongoing violations of federal law. We address these arguments in order.

A

The 2013 Settlement Agreement, on which Allen and Nautilus rely to argue that North Carolina waived its sovereign immunity, provides in relevant part:

> In the event [North Carolina], Intersal, or [Allen and] Nautilus breaches this Agreement, [North Carolina], Intersal, or [Allen and] Nautilus may avail themselves of all remedies provided by law or equity.

Allen and Nautilus maintain that by agreeing to the availability of *all* remedies, North Carolina agreed that the remedies being sought in this action may be obtained from it, thereby effecting a waiver of sovereign immunity from suit in federal court.

We cannot, however, read this provision as a waiver of North Carolina's Eleventh Amendment immunity. First, Eleventh Amendment immunity protects the States, their agencies, and officials from suit *in federal court*. Yet, the subject provision in the 2013 Settlement Agreement makes no reference to federal court, state court or, for that matter, any court. Moreover, the provision states only that each party may pursue available remedies *as provided by* law or equity. Consequently, legal or equitable limitations on

12

those remedies must also apply. And one of those limitations is that a State, its agencies, and its officials acting in their official capacities cannot be sued *in federal court* without their consent. We readily conclude that the provision falls far short of the clear statement that is required to effect a waiver of Eleventh Amendment immunity. As the Supreme Court has made clear, a State must *expressly* consent to suit *in federal court* to waive its immunity under the Eleventh Amendment. *See Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 305–06 (1990); *see also Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999) (explaining that "a State does not consent to suit in federal court merely by consenting to suit in [its own] courts," or by "stating its intention to 'sue and be sued,'" "or even by authorizing suits against it 'in any court of competent jurisdiction'" (citations omitted)).

B

Allen and Nautilus also contend that Congress validly abrogated North Carolina's Eleventh Amendment immunity with the enactment of the Copyright Remedy Clarification Act. That Act provides:

> Any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity, shall not be immune, under the Eleventh Amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court by any person . . . for a violation of any of the exclusive rights of a copyright owner provided by [federal copyright law].

17 U.S.C. § 511(a); *see also id.* § 501(a) (providing that "[a]nyone who violates any of the exclusive rights of [a] copyright owner . . . is an infringer" and that "the term

13

'anyone' includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity").

It is well established that any abrogation of a State's Eleventh Amendment immunity requires both a clear statement of congressional intent — which, to be sure, § 511 provides — and a valid exercise of congressional power. *See Lizzi v. Alexander*, 255 F.3d 128, 134 (4th Cir. 2001) (citing *Seminole Tribe*, 517 U.S. at 55), *abrogated in part on other grounds by Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (2003). Thus, the question presented here reduces to whether Congress validly exercised its constitutional power when enacting the Copyright Remedy Clarification Act.

Allen and Nautilus contend first that Congress validly enacted the Copyright Remedy Clarification Act because it properly invoked Article I's Patent and Copyright Clause, which authorizes Congress to "secur[e] for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. Art. I, § 8, cl. 8. But, as North Carolina correctly notes, that ground for enactment of an abrogation is foreclosed by *Seminole Tribe* and its progeny, which make clear that Congress cannot rely on its Article I powers to abrogate Eleventh Amendment immunity. *See Seminole Tribe*, 517 U.S. at 72–73; *Alden v. Maine*, 527 U.S. 706, 731–33 (1999); *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 636 (1999) ("*Seminole Tribe* makes clear that Congress may not abrogate state sovereign immunity pursuant to its Article I powers; hence the Patent Remedy Act cannot be sustained under either the Commerce Clause or the Patent Clause").

14

Allen and Nautilus argue, however, that those cases were impliedly overruled by the Supreme Court's more recent decision in *Central Virginia Community College v. Katz*, 546 U.S. 356 (2006), which relied on Article I's Bankruptcy Clause to hold that a proceeding initiated by a bankruptcy trustee to set aside preferential transfers by a debtor to a state agency was not barred by sovereign immunity. The *Katz* holding, however, was made in a completely distinguishable context that was unique to the Bankruptcy Clause, and the Court limited its holding to that Clause. *See id.* at 362–77; *see also id.* at 362–63 ("The history of the Bankruptcy Clause, the reasons it was inserted in the Constitution, and the legislation . . . enacted under its auspices immediately following ratification . . . demonstrate that it was intended not just as a grant of legislative authority to Congress, but also to authorize limited subordination of state sovereign immunity in the bankruptcy arena"). Indeed, the Court made clear that its holding in *Katz* was not intended to overrule *Seminole Tribe* and its progeny, stating that it was not disturbing the broader jurisprudence regarding Congress's power to abrogate Eleventh Amendment immunity. *See id.* at 375 n.12, 378–79 (noting "the Framers' intent to exempt laws 'on the subject of Bankruptcies' from the operation of state sovereign immunity principles" and the "limited" "scope of [the States'] consent" to this exemption); *see also id.* at 382 (Thomas, J., dissenting) (noting that "the majority does not purport to overturn" "our established sovereign immunity jurisprudence"). In short, even after *Katz*, it remains clear that Congress cannot rely on the enumerated power in Article I over copyright to compel a State to litigate copyright cases in a federal court.

15

Allen and Nautilus contend that, in any event, Congress validly enacted the Copyright Remedy Clarification Act under the authority granted to it in § 5 of the Fourteenth Amendment, which affords Congress the "power to enforce, by appropriate legislation," the Amendment's substantive guarantees. U.S. Const. amend. XIV, § 5. As they maintain, it is settled that Congress can abrogate sovereign immunity "through a valid exercise of its § 5 power," *Hibbs*, 538 U.S. at 727, because the Eleventh Amendment and the principle of state sovereignty that it embodies "are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment," *id.* (quoting *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976)). North Carolina argues, however, that Congress did not validly exercise its § 5 power in enacting the Copyright Remedy Clarification Act because (1) it did not, as required, purport to rely on its § 5 authority, and (2) it did not, as also required, tailor the Act to an identified, widespread pattern of conduct made unconstitutional by the Fourteenth Amendment.

In construing the scope of § 5 power, the Supreme Court has been careful to strike a considered balance between upholding the dignity of States as sovereign entities, on the one hand, and safeguarding individual rights protected by the Fourteenth Amendment, on the other. It has accordingly explained that Congress has plenary authority to abrogate sovereign immunity for claims arising from state conduct that amounts to an *actual violation* of the Fourteenth Amendment's substantive guarantees. *See United States v. Georgia*, 546 U.S. 151, 158 (2006) (holding that Title II of the Americans with Disabilities Act validly abrogated state sovereign immunity "insofar as [it] create[d] a private cause of action for damages against the States for conduct that *actually* violates

16

the Fourteenth Amendment"). The Court has also interpreted § 5 as permitting Congress to abrogate sovereign immunity for "a somewhat broader swath of [state] conduct, including that which is not itself forbidden by the [Fourteenth] Amendment." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365 (2001). Yet again, however, in light of the competing equities at stake, it has circumscribed Congress's authority to do so in two respects. Congress must both (1) make clear that it is relying on § 5 of the Fourteenth Amendment as the source of its authority and (2) ensure that any abrogation of immunity is "congruen[t] and proportional[]" to the Fourteenth Amendment injury to be prevented or remedied. *Florida Prepaid*, 527 U.S. at 639–42 (quoting *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997)).

In this case, we conclude that in enacting the Copyright Remedy Clarification Act, Congress satisfied neither requirement.

First, it is readily apparent that in enacting the Copyright Remedy Clarification Act, Congress relied on the Copyright Clause in Article I of the Constitution, rather than § 5 of the Fourteenth Amendment. This invocation of Article I authority was expressly and repeatedly stated in the Act's legislative history. *See, e.g.*, H.R. Rep. No. 101-282, pt. 1, at 7 (1989), *as reprinted in* 1990 U.S.C.C.A.N. 3949, 3955 (stating that, based on "the Copyright Clause," the bill would "effect[] a constitutional abrogation of State sovereign immunity"); S. Rep. No. 101-305, at 8 (1990) (stating that "Congress has the power under article I of the Constitution to abrogate the immunity of States" and specifically citing Congress's "plenary power" under "the Copyright Clause"); *see also Nat'l Ass'n of Boards of Pharmacy v. Bd. of Regents*, 633 F.3d 1297, 1313 (11th Cir.

17

2011) ("The legislative history of the [Copyright Remedy Clarification Act] makes clear that Congress intended to abrogate state sovereign immunity under its Article I powers"). Neither the text of the statute nor its legislative history indicates any invocation of authority conferred by § 5 of the Fourteenth Amendment. And without such an invocation, the Act cannot effect a valid abrogation under § 5.

This was made clear in *Florida Prepaid*, where the Supreme Court addressed the constitutionality of the Patent Remedy Act, which abrogated the States' immunity from suit in federal court for patent infringement. After noting that the legislative history indicated that Congress relied on the Commerce Clause, the Patent Clause, and § 5 of the Fourteenth Amendment, the Court stated that the Commerce and Patent Clauses could not sustain the Act in light of *Seminole Tribe*. *Florida Prepaid*, 527 U.S. at 636. Similarly, the Court rejected the plaintiff's alternative argument that the Act could be justified under the Fifth Amendment's Just Compensation Clause:

> There is no suggestion in the language of the statute itself, or in the House or Senate Reports of the bill which became the statute, that Congress had in mind the Just Compensation Clause. . . . Since Congress was so explicit about invoking its authority under Article I and its authority to prevent a State from depriving a person of property without due process of law under the Fourteenth Amendment, we think this omission precludes consideration of the Just Compensation Clause as a basis for the Patent Remedy Act.

*Id*. at 642 n.7.

Here, the legislative history of the Copyright Remedy Clarification Act shows that Congress relied on its Article I power over copyrights and not on § 5 of the Fourteenth Amendment, similarly "preclud[ing] consideration" of § 5 as a proper basis for the Act's abrogation of States' Eleventh Amendment immunity.

18

Allen argues that the Supreme Court's decisions in *EEOC v. Wyoming*, 460 U.S. 226 (1983), and *Kimel v. Florida Board of Regents*, 528 U.S. 62 (2000), undermine any need to invoke *expressly* the Fourteenth Amendment. In *EEOC*, the Court noted that when exercising § 5 power, there is no need to "recite the words 'section 5' or 'Fourteenth Amendment.'" 460 U.S. at 243 n.18. But that quotation does not help Allen and Nautilus because the Court also explained that, regardless of whether the terms "§ 5" or "Fourteenth Amendment" are used, it must "be able to discern some legislative purpose or factual predicate that supports the exercise of [§ 5] power." *Id*. More importantly, *EEOC* was not a case about the abrogation of Eleventh Amendment immunity, and the *EEOC* Court never addressed whether the legislation before it — the Age Discrimination in Employment Act — was a valid exercise of Congress's power under § 5.

Similarly, *Kimel* provides Allen and Nautilus with little support. The *Kimel* Court concluded that the Age Discrimination in Employment Act's abrogation of sovereign immunity was invalid because it was not a congruent and proportional response to unconstitutional age discrimination by the States. *See Kimel*, 528 U.S. at 91–92. They argue that, because the Court reached that conclusion despite the absence of any congressional invocation of the Fourteenth Amendment by Congress, no such invocation should be required here. The *Kimel* Court, however, did not even mention the omission on which Allen and Nautilus rely. And more to the point, no case since *Florida Prepaid* has disavowed the Supreme Court's instruction that an abrogation of sovereign immunity cannot be sustained by a source of constitutional authority that Congress never invoked.

*See Beck v. McDonald*, 848 F.3d 262, 273 (4th Cir. 2017) (explaining that "[t]his court is 'bound by [the] holdings' of the Supreme Court, not its 'unwritten assumptions'" (quoting *Fernandez v. Keisler*, 502 F.3d 337, 343 n.2 (4th Cir. 2007))).

Not only did Congress not invoke its authority under § 5, it also did not, as required, limit the scope of the Copyright Remedy Clarification Act to enforcement of rights protected by the Fourteenth Amendment. Rather, in abrogating sovereign immunity, Congress used language that sweeps so broadly that the Act cannot be deemed a congruent and proportional response to the Fourteenth Amendment injury with which it was confronted.

Our conclusion is required by *Florida Prepaid*, where the circumstances were analogous to those before us. The Supreme Court there concluded that the Patent Remedy Act did not appropriately enforce the Fourteenth Amendment because there was no "congruence and proportionality between the [Fourteenth Amendment] injury to be prevented or remedied and the means adopted to that end." *Florida Prepaid*, 527 U.S. at 638–39 (quoting *City of Boerne*, 521 U.S. at 519–20). While the Court acknowledged that patents are a "species of property" and that patent infringement by States could therefore implicate the Fourteenth Amendment's prohibition against deprivations of property without due process, it explained that a due process violation would not result merely from a State's infringement of a patent. *Id*. at 642–43. Rather, the infringement would both have to go unremedied and have to be done intentionally or at least recklessly. *See id*. at 643, 645 (noting that "a [State's] negligent act that causes unintended injury to a person's property does not 'deprive' that person of property within

20

the meaning of the Due Process Clause" and that "Congress did not focus on instances of intentional or reckless infringement on the part of the States").

Citing at length to the legislative record of the Patent Remedy Act, the *Florida Prepaid* Court then determined that Congress was not faced with sufficient evidence of *unconstitutional* patent infringement to justify abrogation. It observed that there were fewer than 10 patent infringement suits against States in the century preceding the enactment of the Patent Remedy Act; that most state infringement was apparently accidental; and that while state remedies for governmental infringement were disuniform and rather tenuous, the evidence before Congress did not prove such remedies to be constitutionally inadequate. *See Florida Prepaid*, 527 U.S. at 640–45. In the Court's view, this evidence "suggest[ed] that the Patent Remedy Act does not respond to a history of 'widespread and persisting deprivation of constitutional rights' of the sort Congress has faced in enacting proper prophylactic § 5 legislation," *id.* at 645 (quoting *City of Boerne*, 521 U.S. at 526); rather, it provided only "scant support" for the assertion that States were depriving patent owners of property without due process of law, *id.* at 646.

The Court then compared that evidence to the Patent Remedy Act's sweeping abrogation provisions, which made the States liable for patent infringement to the same extent as private parties, and concluded that the provisions were "'so out of proportion to a supposed remedial or preventive object that [they] [could not] be understood as responsive to, or designed to prevent, unconstitutional behavior.'" *Florida Prepaid*, 527 U.S. at 646 (first alteration in original) (quoting *City of Boerne*, 521 U.S. at 532). In

21

particular, the Court observed that Congress had done "nothing to limit the coverage of the [Patent Remedy] Act to cases involving arguable constitutional violations," such as where a State authorized infringement as a matter of official policy or otherwise intentionally infringed patents without providing any remedy. *Id*. at 646–47. Nor had Congress included durational limits or abrogated immunity only for States presenting the greatest incidence of infringement. *Id.* at 647. The absence of such tailoring, juxtaposed with the limited evidence of unconstitutional patent infringement, "ma[de] it clear" that the Patent Remedy Act did not appropriately enforce the Fourteenth Amendment. *Id.*

In this case, a similar legislative record and an equally broad enactment likewise leads to the conclusion that the Copyright Remedy Clarification Act's abrogation of sovereign immunity cannot be sustained under § 5.

While we may presume that a copyright, like a patent, is a "species of property" that could be deprived without due process in violation of the Fourteenth Amendment, not every infringement violates the Constitution, as the *Florida Prepaid* Court explained. To be sure, the legislative record of the Copyright Remedy Clarification Act did include some evidence of copyright infringement by States that presumably violated the Fourteenth Amendment's Due Process Clause. The record of such infringement, however, was materially similar to that in *Florida Prepaid*.

As Allen and Nautilus note, most of the evidence was compiled in a 1988 report prepared at Congress's request by Ralph Oman, who was then the United States Register of Copyrights. *See* U.S. Copyright Office, *Copyright Liability of States and the Eleventh Amendment: A Report of the Register of Copyrights* (June 1988) ("Oman Report"). In

22

preparing the report, the Copyright Office solicited public comments regarding the issue of state immunity from copyright claims and received several dozen responses from various industry groups, among others, expressing grave concerns about the prospect of such immunity. *See* Oman Report at 5–6. But, the Oman Report reveals that only five of the commenters "document[ed] actual problems . . . in attempting to enforce their [copyright] claims against state government infringers." *Id*. at 7. And the commenters' responses described at most seven incidents in which States invoked sovereign immunity to avoid liability for copyright infringement. *See id.* at 7–9. Only two of those incidents recounted in the Register's Report — where States invoked sovereign immunity and continued to display copyrighted films to prison inmates for free even after the copyright holders notified them of the infringement — were described with sufficient detail to show clearly the requisite willfulness of state officials to amount to a due process violation. *See id*. at 7–8. Besides these incidents in the Oman Report, Congress learned of just a few other comparable incidents of unremedied State infringement from hearing testimony. *See, e.g.*, *Copyright Remedy Clarification Act and Copyright Office Report on Copyright Liability of States: Hearings on H.R. 1131 Before the Subcomm. on Courts, Intellectual Prop. & the Admin. of Justice of the H. Comm. on the Judiciary*, 101st Cong. 139–40 (1990) (hereinafter, "House Hearing") (testimony of Bert van der Berg, President, BV Engineering Professional Software); *The Copyright Clarification Act: Hearing on S. 497 Before the Subcomm. on Patents, Copyrights & Trademarks of the S. Comm. on the Judiciary*, 101st Cong. 151–52 (1990) (hereinafter, "Senate Hearing") (statement of William Taylor). In total, even assuming that all of the incidents of

23

unremedied infringement were intentional, the record before Congress contained at most a dozen incidents of copyright infringement by States that could be said to have violated the Fourteenth Amendment.

This evidence plainly falls short of establishing the "widespread and persisting deprivation of constitutional rights" that is required to warrant prophylactic legislation under § 5. *City of Boerne*, 521 U.S. at 526. Indeed, the evidence here appears little different in quality or quantity than the historical evidence underlying the Patent Remedy Act, which was found insufficient in *Florida Prepaid*. Critically, in each case, Congress did not identify an extant pattern of infringement giving rise to violations of the Fourteenth Amendment across a significant number of States. *See Florida Prepaid*, 527 U.S. at 640. At most, the record of the Copyright Remedy Clarification Act, like that of the Patent Remedy Act, indicated that there was *a potential* for greater constitutional violations in the future and that Congress simply "acted to head off this speculative harm." *Id.* at 641; *see also* House Hearing, at 7 (Statement of Ralph Oman) (explaining that the evidence of state infringement "demonstrated at least the potential for harm"); Senate Hearing, at 42 (Statement of Ralph Oman) ("[W]e do not have a great deal of hard evidence [of state copyright infringement]").

Acting against this backdrop of limited evidence, Congress enacted the Copyright Remedy Clarification Act to make States broadly, immediately, and indefinitely accountable for copyright infringement to the same extent as private parties, imposing sweeping liability for *all violations* of federal copyright law, whether the violation implicates the Fourteenth Amendment or not. *See* 17 U.S.C. §§ 501(a), 511. Congress

24

thus declined to narrow whatsoever the Act's reach, instead abrogating immunity indiscriminately in a manner that was wholly incongruous with the sparse record of unconstitutional conduct before it. This failure to adopt any limitation along the lines discussed in *Florida Prepaid* cannot be reconciled with the requirement that legislation enacted under § 5 be "tailor[ed] . . . to remedying or preventing [unconstitutional] conduct." *Florida Prepaid*, 527 U.S. at 639.

Accordingly, we conclude that the Copyright Remedy Clarification Act's wholesale abrogation of sovereign immunity for claims of copyright infringement is grossly disproportionate to the relevant injury under the Fourteenth Amendment, and therefore the abrogation cannot be sustained as an enactment that "appropriate[ly]" "enforce[s]" that Amendment.

In concluding otherwise, the district court sought to distinguish the record in *Florida Prepaid* by relying primarily on the "many examples of copyright infringements by States" in the Copyright Remedy Clarification Act's legislative history. In so relying, however, the court failed to consider whether any of those examples involved intentional and unremedied infringement, as *Florida Prepaid* clearly instructs. Also, as an alternative basis for holding that the Copyright Remedy Clarification Act had validly abrogated North Carolina's immunity, the district court relied on "the amount of suits filed against allegedly infringing states in recent years." That reliance, however, did not comport with the Supreme Court's determination that *Congress* must identify a pattern of unconstitutional conduct *before* it abrogates Eleventh Amendment immunity. *See Florida Prepaid*, 527 U.S. at 639–40; *see also Coleman v. Court of Appeals of Md.*, 566

25

U.S. 30, 42 (plurality opinion) ("States may not be subject to suits . . . unless *Congress has identified* a specific pattern of constitutional violations" (emphasis added)).

In concluding that the Copyright Remedy Clarification Act does not validly abrogate Eleventh Amendment immunity, we join the numerous other courts to have considered this issue since *Florida Prepaid*, all of which have held the Act invalid.  *See, e.g., Chavez v. Arte Publico Press*, 204 F.3d 601, 607–08 (5th Cir. 2000); *Issaenko v. Univ. of Minn.*, 57 F. Supp. 3d 985, 1007–08 (D. Minn. 2014) (collecting a dozen cases).

C

Finally, Allen and Nautilus contend that, at the very least, their claims against the state officials for injunctive and declaratory relief may proceed under the exception to Eleventh Amendment immunity recognized in *Ex parte Young*, 209 U.S. 123 (1908). The parties argued the issue before the district court, but the court, in light of its ruling on the Copyright Remedy Clarification Act, did not address it.  Because we reverse the district court on abrogation, we address the *Ex parte Young* exception and conclude that the exception does not apply in this case.

Under *Ex parte Young,* private citizens may sue state officials in their official capacities in federal court to obtain prospective relief from ongoing violations of federal law. *See Franks v. Ross*, 313 F.3d 184, 197 (4th Cir. 2002); *Antrican v. Odom*, 290 F.3d 178, 184 (4th Cir. 2002).  This exception to Eleventh Amendment immunity "is designed to preserve the constitutional structure established by the Supremacy Clause" and rests on the notion, often referred to as "a fiction," that a state officer who acts unconstitutionally

is "stripped of his official or representative character and [thus] subjected in his person to the consequences of his individual conduct." *Antrican*, 290 F.3d at 184 (quotation marks and citations omitted). To invoke the exception, the plaintiff must identify and seek prospective equitable relief from an *ongoing* violation of federal law. *Id.* at 186.

Allen and Nautilus maintain that they have alleged two ongoing violations from which they seek prospective relief: (1) North Carolina's continuing infringement of Allen's copyrights and (2) its continuing enforcement of an unconstitutional statute, namely, N.C. Gen. Stat. § 121-25(b), which designates images of shipwrecks in the State's custody as public records.

As to the alleged ongoing copyright infringement, Allen and Nautilus identified in their complaint six specific "infringing works" that are "now publicly viewable" at six locations on the Internet, specifying the Internet address for each. North Carolina, however, maintains that shortly before the November 2016 hearing on its motion to dismiss, it removed those allegedly infringing materials from the Internet and provided exhibits to the district court to confirm that it had done so. While Allen and Nautilus acknowledged at oral argument that the six alleged violations had ceased, they argue that the complaint nonetheless alleged generally instances of ongoing Internet infringement beside those six violations, referring to a paragraph that alleged, in a conclusory fashion, that displays of copyrighted materials were continuing "at least at th[ose] locations." But such a general and threadbare catchall, suggesting *the possibility* of other infringing displays, does not plausibly allege the existence of an ongoing violation of federal law. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*,

27

550 U.S. 544, 556–57 (2007)).  In the same vein, Allen and Nautilus argue that because they alleged a history of infringements both before and after the 2013 Settlement Agreement, there is "no reasonable prospect that infringements will cease unless they are enjoined."  This argument, however, which relies on the asserted possibility that North Carolina will resume infringing Allen's copyrights, conflates the *Ex parte Young* exception with the doctrine of mootness.  Even assuming that North Carolina has failed to provide reasonable assurances that it will avoid infringing Allen's copyrights in the future, as would foreclose the voluntary-cessation exception to mootness, it remains Allen's burden in the context of sovereign immunity to establish an *ongoing* violation of federal law to qualify for relief under *Ex parte Young*.  *See Watkins v. Blinzinger*, 789 F.2d 474, 483–84 (7th Cir. 1986) (citing *Green v. Mansour*, 474 U.S. 64 (1985)); *see also DeBauche v. Trani*, 191 F.3d 499, 505 (4th Cir. 1999) (noting that *Ex parte Young* requires "an ongoing violation of federal law" and thus "does not apply when the alleged violation . . . occurred entirely in the past").  Because the only ongoing infringement that Allen and Nautilus plausibly alleged has concededly ended, they cannot employ the *Ex parte Young* exception to address their fear of future infringements.

Allen and Nautilus also identify as an ongoing violation North Carolina's purported continuing "enforcement" of § 121-25(b) to provide a defense against their claims of copyright infringement.  This allegation, however, also cannot support application of the *Ex parte Young* exception because when a plaintiff sues "to enjoin the enforcement of an act alleged to be unconstitutional," the exception applies "only where a party defendant in [such] a suit . . . has '*some connection with the enforcement of the*

28

*Act.*'" *Hutto v. S.C. Ret. Sys.,* 773 F.3d 536, 550 (4th Cir. 2014) (emphasis added) (quoting *Ex parte Young*, 209 U.S. at 157). As we explained in *Hutto*, the "requirement that there be a relationship between the state officials sought to be enjoined and the enforcement of the state statute prevents parties from circumventing a State's Eleventh Amendment immunity." *Id.* We thus noted "that a governor cannot be enjoined by virtue of his general duty to enforce the laws," nor can an "attorney general . . . be enjoined where he has no specific statutory authority to enforce the statute at issue." *Id.* By contrast, however, we have held that a State's circuit court clerk had the requisite connection to the enforcement of the State's marriage laws to be enjoined from enforcing them because the clerk was charged with the particular responsibilities for granting and denying applications for marriage licenses. *See Bostic v. Schaefer*, 760 F.3d 352, 371 n.3 (4th Cir. 2014).

In this case, Allen and Nautilus sued the State, the Governor, the Department, and several Department officials, alleging at most that several of the officials supported enactment of § 121-25(b) and providing no further explanation regarding any connection between the officials and the challenged enactment. Indeed, Allen and Nautilus have not even shown that § 121-25(b) can be enforced against a private party. In any event, in view of the officials' roles, it is apparent that none of them would or could have any role in enforcing the statute, as required. *See Hutto*, 773 F.3d at 550.

Accordingly, we conclude that *Ex parte Young* does not provide Allen and Nautilus with an exception to the Eleventh Amendment immunity claimed by North Carolina.

## III

The North Carolina officials who were sued in their individual capacity for monetary damages contend that the district court erred in denying them qualified immunity and legislative immunity from suit. In doing so, the district court explained that these defendants were not protected by qualified immunity because "the law of [copyright] infringement is clearly established." The court also denied them legislative immunity because it was "premature" to resolve that issue. As we explain, however, we also reverse on these issues.

Qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The inquiry as to whether the law is "clearly established" is a demanding one:

> A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he [or she] is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate.
>
> *     *     *
>
> The Supreme Court has repeatedly told courts . . . not to define clearly established law at a high level of generality. Thus, we consider whether a right is clearly established in light of the specific context of the case, not as a broad general proposition.

*Adams v. Ferguson*, 884 F.3d 219, 226–27 (4th Cir. 2018) (quotation marks and citations omitted).

30

In this case, Allen and Nautilus obtained their rights to take videos and photographs of the *Revenge* shipwreck from Intersal, who in turn obtained the rights from the Department. And any rights that Allen and Nautilus have to those videos and photographs are circumscribed by the provisions of the 2013 Settlement Agreement with the Department. In that Agreement, Intersal asserted — and the Department, Allen, and Nautilus agreed — that Intersal had documented "fifteen (15) years of underwater and other activities related to the [*Queen Anne's Revenge*] project" and that it had the right to produce and retain an interest in a commercial documentary film about those activities. The Agreement provided that the Department could "use [the] completed documentary, free of charge, in museums and exhibits for educational purposes." And the Agreement provided, with respect to non-commercial digital media, that such media should bear "a time code stamp and watermark" of "Nautilus and/or [the Department]" and that the Department would display them only on the Department's website. The Agreement also provided that the Department could retain the archival footage with a time stamp and watermark "for research purposes," although it would return to Nautilus any footage and photographs that did not bear a time code stamp and watermark. Moreover, it provided that "[d]uring the recovery phase of the [*Revenge*] project, [the Department] and Intersal [would] *make available to each other records* created or collected in relation to the [*Revenge*] project," (emphasis added), defining "records" to include "field maps, notes, drawings, photographic records, and other technical, scientific and historical documentation created or collected by [the Department] or Intersal pursuant to the study

31

of the site and the recovery of materials therefrom."  These materials were designated "public records" to be "*curated* by [the Department]."  (Emphasis added).

Notably, the 2013 Settlement Agreement stated that "[n]othing in [the] Agreement shall prevent [the Department] from making records available to the public pursuant to North Carolina General Statutes Chapters 121 and 132, or any other applicable State or federal law or rule related to the inspection of public records."  At that time — *i.e.*, in 2013, before § 121-25(b) was enacted — N.C. Gen. Stat. § 132-1 provided that "all . . . photographs [and] films . . . made or received pursuant to law . . . in connection with the transaction of public business by any agency of North Carolina" are "public records," and that it is "the policy of [the] State that the people may obtain copies of . . . public records . . . free or at minimal cost unless otherwise specifically provided by law."

Based on these provisions of the 2013 Settlement Agreement and the then applicable public records law, it is far from clear whether the Department was prohibited from displaying Allen's copyrighted materials in the manner alleged in the complaint. This is especially so in view of the Department's role in the salvage project to preserve for the public the site and artifacts and to document their salvage in furtherance of research and the education of the public.

Of course, we need not resolve whether North Carolina's display of the video footage and the still photograph violated the Copyright Act to resolve the issue of qualified immunity.  *See Pearson*, 555 U.S. at 231.  What we do conclude is that reasonable officials in the position of the North Carolina officials would not have understood *beyond debate* that their publication of the material violated Allen's rights

32

under the Copyright Act. The issue is indeed debatable. Accordingly, we conclude that Allen and Nautilus's copyright claims against the North Carolina officials in their individual capacities are precluded by qualified immunity.

We also conclude that legislative immunity shields the North Carolina officials in their individual capacities for their alleged involvement in the enactment of § 121-25(b).

The district court did not expressly resolve whether the individual officers were entitled to legislative immunity, concluding instead that such a ruling would be "premature." But its *deferral* in ruling amounted to a *denial* of the immunity because the immunity protects officials "not only from the consequences of litigation's results, but also from *the burden of defending* themselves" in court. *Supreme Court of Va. v. Consumers Union*, 446 U.S. 719, 732 (1980) (emphasis added); *see also Nat'l Ass'n of Soc. Workers v. Harwood*, 69 F.3d 622, 639 (1st Cir. 1995) (noting that legislative immunity is "not simply a defense to liability" but rather "an immunity from suit"). Thus, the very purpose of the immunity is thwarted when an official must expend "time and energy . . . to defend against a lawsuit" arising from his legislative acts. *Bogan v. Scott-Harris*, 523 U.S. 44, 52 (1998). Accordingly, the North Carolina officials can appropriately appeal the district court's deferral in ruling on legislative immunity.

Legislative immunity entitles public officials to absolute immunity for their performance of legislative functions. *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty.*, 684 F.3d 462, 470 (4th Cir. 2012). And it attaches whenever state officials — including those outside the legislative branch — engage in any conduct within the "sphere of legitimate legislative activity." *Id.* (quoting *Bogan,* 523 U.S. at 54).

33

Determining whether official conduct is shielded by legislative immunity "turns on the nature of the act," without regard to the "motive or intent" of the official performing it. *Id.*

In this case, the North Carolina officials were sued in their individual capacities for "conspir[ing] to convert [Allen's] copyrighted works into public documents" through the enactment of § 121-25(b). But the only actual conduct alleged in furtherance of the conspiracy — that the officers "wrote, caused to be introduced, lobbied for passage of, and obtained passage" of § 121-25(b) — is quintessentially legislative in nature and falls squarely within the scope of legislative immunity. Allen and Nautilus's only argument to the contrary is that the complaint alleges that the officers sought enactment of § 121-25(b) with *impure motives*, seeking to benefit an affiliated nonprofit entity and to remove the threat of legal liability. As noted, however, motive is irrelevant to the issue. *Kensington Vol. Fire Dep't*, 684 F.3d at 470; *McCray v. Md. Dep't of Transp., Md. Transit Admin.,* 741 F.3d 480, 485 (4th Cir. 2014) (noting that "[l]egislative immunity is a shield that protects despicable motives as much as it protects pure ones").

\* \* \*

For the foregoing reasons, we reverse each of the district court's rulings on immunity and remand with instructions that the district court dismiss without prejudice Allen and Nautilus's claims against North Carolina, the Department, and the public officials acting in their official capacities and to dismiss with prejudice the remaining claims against the officials in their individual capacities.

34

REVERSED AND REMANDED WITH INSTRUCTIONS